## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

DEVELOPERS SURETY AND INDEMNITY  )
COMPANY, a foreign corporation,                )
                                                                )
      Plaintiff,                            )
                                                                )
v.                                                              )            Case No.
                                                                )    6:16-CV-1875-ORL-40-KRS
ARCHER WESTERN CONTRACTORS, LLC  )
A foreign corporation,                              )
                                                                )
      Defendant.                         )
                                                                )
                                                                )

### ARCHER WESTERN CONTRACTORS, LLC'S, ANSWER TO PLAINTIFF'S AMENDED COMPLAINT FOR DECLARATORY RELIEF, AFFIRMATIVE DEFENSES AND COUNTERCLAIM AGAINST DEVELOPERS SURETY AND INDEMNITY COMPANY

NOW COMES Defendant, ARCHER WESTERN CONTRACTORS, LLC ("Archer"), by and through their attorneys, Watt, Tieder, Hoffar & Fitzgerald, LLP and their Answer to Amended Complaint for Declaratory Relief states as follows:

### I. JURISDICTION AND VENUE

1.      The allegations in Paragraph 1 constitute a legal conclusion to which no response is required. To the extent a response is required, Archer is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this Paragraph and, therefore, deny the allegations.

2.      The allegations in Paragraph 2 constitute a legal conclusion to which no response is required. To the extent a response is required, Archer is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this Paragraph and, therefore, deny the allegations.

3.      Archer is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 3, therefore, Archer denies the allegations contained in this Paragraph.

4.      Archer admits the allegations contained in Paragraph 4.

5.      The allegations in Paragraph 5 constitute a legal conclusion to which no response is required. To the extent a response is required, Archer is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this Paragraph and, therefore, deny the allegations.

6.      The allegations in Paragraph 6 constitute a legal conclusion to which no response is required. To the extent a response is required, Archer is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this Paragraph and, therefore, deny the allegations.

7.      The allegations in Paragraph 7 constitute a legal conclusion to which no response is required. To the extent a response is required, Archer is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this Paragraph and, therefore, deny the allegations.

## II. GENERAL ALLEGATIONS

8.      Archer admits that it entered into a Subcontract Agreement with Prince Land Services, Inc. for certain work on the construction project commonly known as Orlando Sunrail Station Finishes. Archer specifically denies that Exhibit A is a true and correct copy of the Subcontract Agreement. Archer also denies the remaining allegations contained in Paragraph 8.

9.      Archer states that the Subcontract is a written agreement, the terms of which are the best evidence of the rights and obligations of the parties. Archer therefore specifically

denies all allegations in this Paragraph which are inconsistent with the terms of the Subcontract including Plaintiff's emphasis added to the provision.

10.      Archer states that the Subcontract is a written agreement, the terms of which are the best evidence of the rights and obligations of the parties. Archer therefore specifically denies all allegations in this Paragraph which are inconsistent with the terms of the Subcontract including Plaintiff's emphasis added to the provision.

11.      Archer admits that DSIC issued a Subcontractor Performance Bond bearing no. 504957P on behalf of Prince, as principal, for the benefit of Archer, as obligee, covering Prince's bonded work under the Subcontract. Archer specifically denies that the Bond attached to DSIC's complaint as Exhibit B is a true and correct copy of the Bond.

12.      Archer denies that this is the entirety of Paragraph 4 of the Bond. Specifically, Archer responds that DSIC conveniently failed to include subsection (e) allowing for DSIC to seek an extension up to fifty (50) calendar days in time to act under Paragraph 4 of the Bond by financing performance of the Subcontract Work during the extension period. See Bond(4)(e). Archer further states that the Bond is a written agreement, the terms of which are the best evidence of the rights and obligations of the parties. Archer therefore specifically denies all allegations in this paragraph which are inconsistent with the terms of the Bond including Plaintiff's emphasis added to the provision.

13.      Archer admits that in the spring of 2014, the Project was nearing substantial completion and the owner issued punch lists for landscaping throughout the Project. Archer admits that Prince failed to timely perform its punch list work, and after further review, it was discovered that a significant portion of Prince's work did not meet the performance criteria set forth in the Subcontract. Archer admits that these failures were compounded by Prince's poor

installation of the landscape materials. Archer denies the remaining allegations contained in Paragraph 13.

14.     Archer admits it sent a notice of default dated July 3, 2014, to Prince stating that Prince had failed to meet the requirements of landscaping and irrigation for the Project. Archer further states that its letter dated July 3, 2014, and attached thereto as Exhibit C, speaks for itself. Archer therefore specifically denies all allegations in this Paragraph which are inconsistent with the letter.

15.     Archer denies the allegations contained in Paragraph 15.

16.     Archer admits it sent DSIC a letter dated July 9, 2014, making a claim on the Bond and demanding that DSIC respond to Archer's declaration of default in accordance with the terms of the Bond. Archer further states that its letter dated July 9, 2014, and attached thereto as Exhibit D, speaks for itself. Archer therefore specifically denies all allegations in this paragraph which are inconsistent with the letter.

17.     Archer admits that DSIC sent a letter to Archer dated July 14, 2014. Archer states that DSIC's letter dated July 14, 2014, and attached thereto as Exhibit E, speaks for itself. Archer therefore specifically denies all allegations in this paragraph which are inconsistent with the letter.

18.     Archer denies the allegations contained in Paragraph 18.

19.     Archer denies the allegations contained in Paragraph 19.

20.     Archer admits that DSIC sent an email to Archer dated July 18, 2014. Archer states that DSIC's email dated July 18, 2014, and attached thereto as Exhibit F, speaks for itself. Archer therefore specifically denies all allegations in this Paragraph which are inconsistent with the email.

21.     Archer denies the allegations contained in Paragraph 21.

22.     Archer denies the allegations contained in Paragraph 22.

23.     Archer denies the allegations contained in Paragraph 23.

24.     Archer admits that DSIC sent an email to Archer dated August 20, 2014. Archer states that DSIC's email dated August 20, 2014, and attached thereto as Exhibit G, speaks for itself. Archer therefore specifically denies all allegations in this Paragraph which are inconsistent with the email.

25.     Archer denies the allegations contained in Paragraph 25.

26.     Archer denies that it retained a contractor to replace Prince and complete the Subcontract on or before May 30, 2014. Archer admits it sent an email dated May 30, 2014, to Prince. Archer states that its email dated May 30, 2014, and attached thereto as Exhibit H, speaks for itself. Archer therefore specifically denies all allegations in this Paragraph which are inconsistent with the email.

27.     Archer admits that pursuant to its rights under Article 8.1 of the Subcontract it sought a contractor to remedy Prince's default and in addition, Archer retained a landscape architect to develop a corrective action plan to remediate Prince's work. On July 29, 2014 and after the fifteen (15) day response period for DSIC to respond to Archer's claim had expired, Archer contracted with Lafleur Nurseries and Garden Center to remediate and complete Prince's landscaping work. Archer also admits that Prince failed to complete its paver work prior to abandoning the Project, as such, Archer used its own labor to complete this area of Prince's work.  Archer denies the remaining allegations in Paragraph 27.

28.     Archer admits that DSIC denied Archer's claim on the Bond.

29.     Archer admits it sent a letter to DSIC dated August 29, 2016, demanding of the $631,148.65 in costs incurred by Archer to remediate Prince's default pursuant to its rights under Article 8.1 of the Subcontract and the Bond. Archer further states that its letter dated August 29, 2016, and attached thereto as Exhibit I, speaks for itself, and specifically denies that Exhibit I contains the attachments to the August 29, 2016 letter, as well as, all allegations in this Paragraph which are inconsistent with the letter.

## III. DECLARATORY RELIEF SOUGHT

30.     Archer incorporates and restates in this Paragraph its responses to Paragraphs 1-29.

31.     To the extent the allegations contained in Paragraph 31 constitute a legal conclusion, no response is required, to the extent a response is required, Archer denies the allegations contained in Paragraph 31.

32.     Archer admits that it asserted a claim on the Bond on July 9, 2014. Archer denies the remaining allegations contained in Paragraph 32.

33.     Archer denies the allegations contained in Paragraph 33.

34.     Archer denies the allegations contained in Paragraph 34.

35.     Archer denies the allegations contained in Paragraph 35.

36.     The allegations in Paragraph 36 constitute a legal conclusion to which no response is required. To the extent a response is required Archer denies the allegations contained in Paragraph 36.

37.     Archer denies the allegations contained in Paragraph 37.

## PRAYER FOR RELIEF

WHEREFORE, Defendant, ARCHER WESTERN CONTRACTORS, LLC, prays that

the Court enter an order providing the following relief:

(a)   Dismiss Plaintiff's, Developers Surety & Indemnity Company, Amended Complaint for Declaratory Relief;

(b)   Enter judgment against Developers Surety & Indemnity Company in favor of Archer Western Contractors, LLC, and for an award of costs, interest and attorneys' fees pursuant to the Subcontract and Bond, Fla. Stat. 624.428, 627.756, 255.05, and/or 255.071; and

(c)   For such additional relief as this Court deems equitable and just.

## AFFIRMATIVE DEFENSES

NOW COMES the Defendant, ARCHER WESTERN CONTRACTORS, LLC, ("Archer"), by and through its undersigned counsel, and for its Affirmative Defenses to Plaintiff, Developers Surety & Indemnity Company's ("DSIC") Complaint states as follows:

1.     Archer, as general contractor, entered into a Subcontract Agreement ("Subcontract") dated May 21, 2012, with Prince Land Services, Inc. ("Prince"), for certain landscape and irrigation work on the project commonly known as Orlando Sunrail Station Finishes located at 2490 Country Club Road, Sanford, Florida 32771 ("Project").

2.     Pursuant to the Subcontract, Prince, as principal, obtained Subcontractor Performance Bond No. 504957P ("Bond") from DSIC, as surety, for the benefit of Archer, as obligee, in the penal sum amount of $710,895.93 to guarantee the performance of Prince under the Subcontract for the Project.

3.     A dispute subsequently arose between Archer and Prince during the Prince's performance of the Subcontract.

4.     Archer sent a notice of default to Prince in a letter dated July 3, 2014.

5.     In a letter dated July 9, 2014, Archer made a claim on the Bond for Prince's default of the Subcontract stating that "Archer Western hereby makes a claim on the Bond and demands that Developers respond to Archer Western's declaration of default in accordance with the terms of the Bond."

6.     DSIC did not take any action under the Bond pursuant to Paragraph 4 of the Bond during the time frame set forth in the Bond.

7.     In a letter dated August 29, 2016, demanded reimbursement of $631,148.65 in costs incurred by Archer to remediate Prince's default of the Subcontract in accordance with

Section 6 of the Bond.

8.     To-date, DSIC has failed to make any payments to Archer for the costs incurred as a result of Prince's default of the Subcontract and claim on the Bond.

## AFFIRMATIVE DEFENSE NO. 1
## PRIOR BREACH BY DSIC

DSIC breached the terms of the Bond by, among other things, failing to timely respond to Archer's claim in accordance with Paragraph 4 of the Bond.

## AFFIRMATIVE DEFENSE NO. 2
## UNTIMELY RESPONSE

DSIC's relief sought is barred based on its untimely response to Archer's Bond claim. Had DSIC promptly responded pursuant to Paragraph 4 of the Bond, Archer may not have incurred the costs to remediate Prince's default of the Subcontract.

## AFFIRMATIVE DEFENSE NO. 3
## LACHES

DSIC's relief sought is barred under the doctrine of laches for its lack of diligence and delay in exercising its rights under the Bond, and the corresponding prejudice to Archer as a result of reliance upon DSIC's failure to adhere to the terms of its Bond.

## AFFIRMATIVE DEFENSE NO. 4
## ESTOPPEL

DSIC is estopped from denying payment to Archer under the Bond as a result of its failure to timely respond to Archer's Bond Claim pursuant to Paragraph 4 of the Bond.

## AFFIRMATIVE DEFENSE NO. 5
## WAIVER

DSIC waived its right to exercise its contractual right to remedy the default under Paragraph 4 of the Bond based on its failure to timely respond to Archer's Bond Claim as required by Paragraph 4 of the Bond.

## AFFIRMATIVE DEFENSE NO. 6
## <u>UNCLEAN HANDS</u>

DSIC's relief sought is barred under the doctrine of unclean hands for its lack of diligence and delay in exercising its rights under the Bond, and the corresponding prejudice to Archer as a result of reliance upon DSIC's failure to adhere to the terms of its Bond.

## PRAYER FOR RELIEF

WHEREFORE, Defendant, ARCHER WESTERN CONTRACTORS, LLC, prays that the Court enter an order providing the following relief:

(a) Dismiss Plaintiff's, Developers Surety & Indemnity Company, Amended Complaint for Declaratory Relief;

(b) Enter judgment against Developers Surety & Indemnity Company in favor of Archer Western Contractors, LLC, and for an award of costs, interest and attorneys' fees pursuant to the Subcontract and Bond, Fla. Stat. 624.428, 627.756, 255.05, and/or 255.071; and

(c) For such additional relief as this Court deems equitable and just.

## <u>COUNTERCLAIM AGAINST DEVELOPERS SURETY</u><br><u>AND INDEMNITY COMPANY</u>

Counterclaimant, ARCHER WESTERN CONTRACTORS, LLC ("Archer"), by and through its undersigned counsel, for its Counterclaim against Counterclaim Defendant, Developers Surety & Indemnity Company ("DSIC"), states and alleges as follows:

### <u>Parties, Jurisdiction and Venue</u>

1.     This is an action for declaratory judgment and supplemental relief under 28 U.S.C. §§2201 and 2202.

2.     Subject matter jurisdiction is based upon 28 U.S.C. §1332(a)(1), diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds the jurisdictional limits of this Court.

3.     DSIC alleges it is a corporation organized and existing under the laws of the State of Iowa, whose principal place of business is located in Irvine, California, and who is duly registered and authorized to do business in the State of Florida. DSIC also has alleged that it is a citizen of the states of Iowa and California.

4.     Archer is a Delaware limited liability company with its headquarters in Chicago, Illinois. The members of AWC are The Walsh Group, Ltd., Matthew M. Walsh and Daniel J. Walsh. The Walsh Group, Ltd. is an Illinois corporation with its principal place of business in Chicago, Illinois. Matthew M. Walsh and Daniel J. Walsh are citizens of Illinois.

5.     The amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorneys' fees, and this Court otherwise has jurisdiction over the subject matter hereof.

6.     Venue is proper in this Court because the contract at issue in this case was to be performed in this jurisdiction.

## **Factual Background**

### A.  The Subcontract and Bond

7.        Archer, as general contractor, entered into a Subcontract Agreement ("Subcontract") dated May 21, 2012, with Prince Land Services, Inc. ("Prince"), for certain landscape and irrigation work on the project commonly known as Orlando Sunrail Station Finishes located at 2490 Country Club Road, Sanford, Florida 32771 ("Project"). A true and correct copy of the Subcontract is attached hereto as Exhibit A.

8.        The Subcontract provides in relevant part:

> 8.1 Failure of Performance and Default. If the Contractor determines at its sole discretion that the Subcontractor has: (i) refused or failed to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work; (ii) failed to make prompt payment for, or failed to prevent claims of non-payment from, its workers, subcontractors or suppliers of any tier; (iii) disregarded Laws or orders of any public authority having jurisdiction; or (iv) otherwise materially breached, a provision of this Agreement; and Subcontractor fails within seventy-two (72) hours after receipt of written notice (facsimile, email, or letter, shall constitute sufficient written notice and declaration of default) to commence and continue satisfactory correction of such default with diligence and promptness, the Contractor, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies: (i) supply such number of workers and quantity of materials, equipment and other facilities as the Contractor deems necessary for the completion of the Subcontractors Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of same including reasonable overhead, profit and attorney's fees; (ii) contract with one or more additional contractors to perform such part of the Subcontractor's Work as the Contractor shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor who shall be liable for the payment of same including reasonable overhead and profit; (iii) discharge the claim of non-payment; and/or (iv) withhold payment of any moneys due the Subcontractor pending corrective action to the extent required by and to the satisfaction of the Contractor, Owner and the Architect/Engineer.

> Any costs incurred by Contractor under this article, including attorneys' fees, shall to deducted from funds otherwise due Subcontractor under this Agreement.

Subcontract, §8.1, Exhibit A.

9.      The Agreement further requires that the Prince obtain a surety bond "guaranteeing full performance of this Subcontract and that Subcontractor will promptly and fully pay for all work, labor and materials and other charges or costs in connection with the Subcontractor's Work." Subcontract, §7.14, Exhibit A.

10.     Pursuant to the Subcontract, Prince, as principal, obtained Subcontractor Performance Bond No. 504957P ("Bond") from DSIC, as surety, for the benefit of Archer, as obligee, in the penal sum amount of $710,895.93 to guarantee the performance of Prince under the Subcontract for the Project. A true and correct copy of the Bond is attached hereto as Exhibit B.

11.     The Bond expressly incorporates the Subcontract. See Bond, Exhibit B.

12.     Paragraph 4 of the Bond specifically outlines DSIC's obligations when Archer declares Prince in default of the Subcontract:

> Whenever Obligee has declared Subcontractor to be IN DEFAULT OF THE SUBCONTRACT, the Surety shall, within fifteen (15) calendar days of its receipt of notice from Obligee that Subcontractor is in default, respond as follows:
>
> a.      Complete the Subcontract Work in accordance with the Subcontract terms and conditions; or
>
> b.      Obtain bids or offers from contractors acceptable to Obligee for completing the Subcontract in accordance with its terms and conditions, and upon determination by Obligee and the Surety jointly of the lowest responsible bidder or offeror, arrange for a subcontract between such completion contractor and the Obligee, and arrange for new performance and payment bonds for such completion contractor from a surety acceptable to the Obligee. Upon acceptance of the completion contractor by the

Obligee, the Surety shall pay to the Obligee the difference between the cost to complete the Subcontract work and the balance of the Subcontract Price including the cost of obtaining new performance and payment bonds; or

c.      Tender to Obligee the penal Sum of the Bond less any amounts expended by the Surety in financing the Subcontractor pursuant to Paragraphs 3 or 4(e) hereof.

d.      Having made an independent investigation of the facts and circumstances of the alleged default, deny its liability in whole or in part and notify and explain to the Obligee the reasons why the Surety believes it does not have liability for the default, in which event Obligee may proceed to take such action as may be allowed under the Subcontract or at law and the Surety's liability shall be determined in accordance with Paragraph 10 hereof.

e.      Upon request, Surety shall be entitled to obtain an extension of up to fifty (50) calendar days in the time to act under this Paragraph 4 by financing performance of the Subcontract Work during the extension period on a schedule and in a manner acceptable to Obligee. The cost of such financing assistance provided by Surety shall reduce the penal sum of this Bond, but Obligee shall have no obligation to reimburse Surety or otherwise pay for the work performed until Surety has committed to remedy the default pursuant to this Subparagraphs 4, and then only form funds earned under the Subcontract. To the extent the cost of such financing assistance exceeds the amount earned under the terms of the Subcontract for the work accomplished, such costs shall not be refunded to the Surety but shall be applied to reduce the penal sum of this Bond.

See Bond, ¶4, Exhibit B.

13.      The Bond also states that "[u]pon issuance of written notice by [DSIC] to [Archer] of the commitment to remedy the default through one of the options set forth in Paragraphs 4," Archer is to make available as the Subcontract work progresses the balance of the Subcontract price. See Bond, ¶5, Exhibit B.

14.      The Bond further provides that the Surety shall be liable for the following:

a.      The responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work.

b.      The responsibilities of the Subcontractor for additional legal and design professional costs resulting or arising from the Subcontractor's default, or resulting or arising from the actions or failure to act of the Surety under Paragraph 4 herein.

c.      The responsibilities of the Subcontractor for liquidated damages, or if no liquidated damages are specified in the Subcontract, actual damages caused by the delayed performance or non-performance of the Subcontractor.

See Bond, ¶6, Exhibit B.

15.     The Bond also states that "[DSIC] agrees to pay [Archer] its reasonable attorney's fees and costs in the event that suit on this Bond is commenced and successfully prosecuted by [Archer]." See Bond, ¶7, Exhibit B.

### B.  Archer's Bond Claim

16.     In the Spring of 2014, the Project was nearing substantial completion and the owner issued punch lists for landscaping throughout the Project.

17.     Prince failed to timely perform its punch list work, and after further review, Archer discovered that a significant portion of Prince's work did not meet the performance criteria set forth in the project plans and specifications and Subcontract. These failures were compounded by Prince's poor installation of the landscape materials.

18.     In a letter dated July 3, 2014, Archer served a notice of default on Prince stating that Prince had failed to meet the requirements of landscaping and irrigation for the Project. Archer requested that Prince cure its defects within seventy-two (72) hours and warned that "if Prince fails to cure its default within the prescribed period Archer Western will take whatever steps it deems necessary to mitigate the damages caused by Prince's default." ("Notice of Default"). A true and correct copy of Archer's Notice of Default is attached hereto as Exhibit C.

19.     Archer's Notice of Default was sent via overnight delivery. See Notice of Default, Exhibit C.

20.     Prince did not timely cure its defaults outlined in Archer's Notice of Default.

21.     After Prince failed to cure its default, in a letter dated July 9, 2014, Archer asserted a claim on the Bond by notifying DSIC that Archer declared Prince in default of the Subcontract and stating that "Archer Western hereby makes a claim on the Bond and demands that Developers respond to Archer Western's declaration of default in accordance with the terms of the Bond." ("Bond Claim"). A true and correct copy of Archer's July 9th Letter is attached hereto as Exhibit D.

22.     Archer's Bond Claim was sent to DSIC via overnight delivery. See Bond Claim, Exhibit D.

23.     Archer's Bond Claim included a copy of Archer's Notice of Default explaining that Archer declared Prince in default of the Subcontract on July 3, 2014. See Bond Claim, Exhibit D.

24.     In a letter dated July 14, 2014, DSIC acknowledged receipt of Archer's Bond Claim. A true and correct copy of DSIC's July 14th Letter is attached hereto as Exhibit E.

25.     In its July 14th letter, DSIC unilaterally and without authority attempted to modify and toll its fifteen (15) day response deadline governed by Paragraph 4 of the Bond by stating that "[p]ursuant to the terms of the Bond, DSIC shall respond to AWC's purported declaration of default against PLS within fifteen (15) calendar days of receipt of the foregoing enumerated documents." See Exhibit E.

26.     Notably, Archer did not consent to DSIC's unilateral attempt to toll the fifteen (15) day deadline DSIC had to respond under the Bond.

27.     Pursuant to Paragraph 4 of the Bond DSIC had until July 25, 2014, to respond in one of the five ways to Archer's Bond Claim: (1) complete Prince's subcontract work; (2) obtain bids from contractors to complete Prince's subcontract work; (3) tender the penal sum of the Bond to Archer; (4) having made an independent investigation of Prince's alleged default, deny Archer's Bond Claim; or (5) request an extension of up to fifty (50) days by financing performance of the Subcontract Work. See Bond, ¶4, Exhibit B.

28.     DSIC did not complete Prince's subcontract work within fifteen (15) calendar days of DSIC's receipt of notice from Archer that Prince is in default of the Subcontract.

29.     DSIC did not obtain bids from other contractors acceptable to Archer to complete Prince's subcontract work within fifteen (15) calendar days of DSIC's receipt of notice from Archer that Prince is in default of the Subcontract.

30.     DSIC did not tender the penal sum of the Bond to Archer within fifteen (15) calendar days of DSIC's receipt of notice from Archer that Prince is in default of the Subcontract.

31.     DSIC did not, having made an independent investigation of Prince's alleged default, deny Archer's Bond Claim within fifteen (15) calendar days of DSIC's receipt of notice from Archer that Prince is in default of the Subcontract.

32.     DSIC did not request an extension of up to fifty (50) days by financing performance of Prince's Subcontract Work within fifteen (15) calendar days of DSIC's receipt of notice from Archer that Prince is in default of the Subcontract.

33.     DSIC did not respond to Archer's Bond Claim pursuant to any of its options under Paragraph 4 of the Bond by July 25, 2014, its fifteen (15) day deadline including, but not limited to, DSIC did not request a fifty (50) day extension to respond pursuant to subparagraph

e.

34.     DSIC did not respond to Archer's Bond Claim pursuant to its options under Paragraph 4 of the Bond until October 16, 2014, whereby DSIC denied Archer's Bond Claim. A true and correct copy of DSIC's denial letter is attached hereto as Exhibit F.

35.     Archer did not waive or modify the fifteen (15) day requirement in Paragraph 4 of the Bond.

36.     Archer did not grant DSIC a fifty (50) day extension to respond under Paragraph 4(d) of the Bond.

### C.  Walsh's Performance of Prince's Subcontract Work.

37.     As a result of DSIC's failure to timely abide by Paragraph 4 of the Bond, and also pursuant to Article 8.1 of the Subcontract, Archer was entitled to perform Prince's remaining Subcontract Work and correct Prince's non-conforming Work, and charge the cost thereof to the Subcontractor  who shall be liable for the payment of same including reasonable overhead and profit. *See* Subcontract, §8.1, Exhibit A.

38.     DSIC is liable for such costs Archer incurred for performing Prince's remaining Subcontract Work, and correcting Prince's non-conforming Subcontract Work pursuant to Section 6(a) of the Bond which states, "the surety shall be liable for the responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work." See Bond, §6(a), Exhibit B.

39.     As a result of DSIC's failure to timely abide by Paragraph 4 of the Bond, and also pursuant to Article 8.1 of the Subcontract, Archer was entitled to contract with a replacement contractor to perform Prince's remaining Subcontract Work and correct Prince's non-conforming Work, and charge the cost thereof to the Subcontractor who shall be liable for

the payment of same including reasonable overhead and profit. *See* Subcontract, §8.1, <u>Exhibit A</u>.

40.     DSIC is liable for such costs Archer incurred for hiring a replacement contractor to perform Prince's remaining Subcontract Work, and correct Prince's non-conforming Subcontract Work pursuant to Section 6(a) of the Bond which states, "the surety shall be liable for the responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work." See Bond, §6(a), <u>Exhibit B</u>.

41.     In order to avoid further delay to the Project schedule and liquidated damages at $5,181.62 per day, Archer, on or about July 29, 2014, after DSIC's fifteen (15) day response period had expired, contracted with Lafleur Nurseries and Garden Center, to remediate and complete Prince's Subcontract work.

42.     Archer used its own labor to complete certain paving work Prince failed to complete prior to its default of the Subcontract.

43.     Through Archer's diligent efforts it was able to remediate Prince's work, obtain final acceptance of the Project by the owner in a timely fashion and avoid the assessment of any liquidated damages for the delays caused by Prince's default of the Subcontract.

44.     In a letter dated August 29, 2016, after the remediation of Prince's default was complete, Archer requested reimbursement in the amount of $631,148.65 from DSIC for Archer's costs incurred to remediate Prince's default of the Subcontract. A true and correct copy of Archer's August 29th Letter is attached hereto as <u>Exhibit G</u>.

45.     To date, DSIC has failed to reimburse Archer any monies related to its Bond Claim.

## Count I. Declaratory Relief

46.     Archer re-alleges all of the allegations contained in paragraphs 1 through 45 hereof, as if fully set forth herein.

47.     There is a bona fide present controversy between the parties covering the rights and obligations of DSIC and Archer under the Bond.

48.     The Bond provided that whenever Archer declared Prince to be in default of the Subcontract, DSIC "shall, within fifteen (15) calendar day of its receipt of its notice from [Archer] that [Prince] is in default, respond" in one of the five following ways: (1) complete Prince's subcontract work; (2) obtain bids from contractors acceptable to Archer to complete Prince's subcontract work; (3) tender the penal sum of the Bond to Archer; (4) having made an independent investigation of Prince's alleged default, deny Archer's Bond Claim; or (5) request an extension of up to fifty (50) days by financing performance of the Subcontract Work. See Bond, ¶4, Exhibit B.

49.     Archer sent its Bond Claim, via overnight delivery to DSIC, declaring Prince in default of the Subcontract and stating that "Archer Western hereby makes a claim on the Bond and demands that Developers respond to Archer Western's declaration of default in accordance with the terms of the Bond." ("Bond Claim"). See Bond Claim, Exhibit D.

50.     DSIC did not respond to Archer's Bond Claim pursuant to any of its options under Paragraph 4 of the Bond by July 25, 2014, its fifteen (15) day deadline.

51.     DSIC did not respond to Archer's Bond Claim pursuant to its options under Paragraph 4 of the Bond until October 16, 2014, whereby DSIC denied Archer's Bond claim. DSIC's denial letter, Exhibit F.

52.     As a result of DSIC's failure to timely abide by Paragraph 4 of the Bond, and

also pursuant to Article 8.1 of the Subcontract, Archer was entitled to perform Prince's remaining Subcontract Work and correct Prince's non-conforming Work, and charge the cost thereof to the Subcontractor  who shall be liable for the payment of same including reasonable overhead and profit. *See* Subcontract, §8.1, <u>Exhibit A</u>.

53.     DSIC is liable for such costs Archer incurred for performing Prince's remaining Subcontract Work, and correcting Prince's non-conforming Subcontract Work pursuant to Section 6(a) of the Bond which states, "the surety shall be liable for the responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work." See Bond, §6(a), <u>Exhibit B</u>.

54.     As a result of DSIC's failure to timely abide by Paragraph 4 of the Bond, and also pursuant to Article 8.1 of the Subcontract, Archer was entitled to contract with a replacement contractor to perform Prince's remaining Subcontract Work and correct Prince's non-conforming Work, and charge the cost thereof to the Subcontractor who shall be liable for the payment of same including reasonable overhead and profit. *See* Subcontract, §8.1, <u>Exhibit A</u>.

55.     DSIC is liable for such costs Archer incurred for hiring a replacement contractor to perform Prince's remaining Subcontract Work, and correct Prince's non-conforming Subcontract Work pursuant to Section 6(a) of the Bond which states, "the surety shall be liable for the responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work." See Bond, §6(a), <u>Exhibit B</u>.

56.     Archer hired a replacement subcontractor and used its own efforts to remediate Prince's default of the Subcontract.

57.     Archer incurred reimbursable costs and expenses in the amount of $631,148.65

to remediate Prince's default of the Subcontract.

58.     The Bond provides that the DSIC agreed to be liable for, among other things, the following: (1) correction of Prince's defective or incomplete Subcontract work; (2) legal and design costs result from or arising from Prince's default, or resulting or arising from the actions or failure to act of the DSIC under Paragraph 4 of the Bond; and (3) liquidated and delay damages. See Bond, ¶6, Exhibit B.

59.     In a letter dated August 29, 2016, after the remediation of Prince's default was complete through the use of Archer's replacement subcontractor and its own efforts, Archer requested reimbursement in the amount of $631,148.65 from DSIC for Archer's costs incurred to remediate Prince's default of the Subcontract. See Archer's August 29th Letter, Exhibit G.

60.     To date, DSIC has failed to reimburse Archer any monies related to its Bond Claim.

61.     Despite Archer's written demands, DSIC has breached the Bond by (1) failing to timely respond in accordance with Paragraph 4 of the Bond; and (2) failing to reimburse Archer for costs incurred in remediating Prince's default of the Subcontract.

62.     Archer has been damaged by DSIC's material breach of the Bond in the amount of $631,148.65, plus other costs and expenses, including attorneys' fees and interest, which Archer will continue to accrue throughout the instant lawsuit. See Bond, ¶7, Exhibit B.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant, ARCHER WESTERN CONTRACTORS, LLC, prays that the Court enter an order providing the following relief:

(d)     Declare that DSIC breached the Bond;

(e)     Declare that Archer was contractually entitled to hire a replacement contractor and use its own efforts to remediate Prince's default of the

Subcontract pursuant to the terms Subcontract and Bond;

(f)     Declare that DSIC is liable to Archer for its costs and expenses it incurred to remediate Prince's default of the Subcontract pursuant to the terms Subcontract and Bond;

(g)     Declare that DSIC is liable to Archer for the costs and expenses it incurred to remediate Prince's default of the Subcontract amounting to $631,148.65, plus all cost and expense, including attorneys' fees and interest pursuant to the Subcontract and Bond, and Fla. Stat. 57.105, in the amount that Archer has and will incur, and any other amounts proven at trial; and

(h)     For such additional relief as this Court deems equitable and just.

## Count II. Breach of the Bond

63.     Archer re-alleges all of the allegations contained in paragraphs 1 through 62 hereof, as if fully set forth herein.

64.     The Bond is an enforceable written agreement for the benefit of Archer, as obligee.

65.     The Bond provided that whenever Archer declared Prince to be in default of the Subcontract, DSIC "shall, within fifteen (15) calendar day of its receipt of its notice from [Archer] that [Prince] is in default, respond" in one of the five following ways: (1) complete Prince's subcontract work; (2) obtain bids from contractors acceptable to Archer to complete Prince's subcontract work; (3) tender the penal sum of the Bond to Archer; (4) having made an independent investigation, deny Archer's Bond Claim; or (5) request an extension of up to fifty (50) days by financing performance of the Subcontract Work. See Bond, ¶4, Exhibit B.

66.     Archer sent its Bond Claim, via overnight delivery to DSIC, declaring Prince in default of the Subcontract and stating that "Archer Western hereby makes a claim on the Bond and demands that Developers respond to Archer Western's declaration of default in accordance with the terms of the Bond." ("Bond Claim"). See Bond Claim, Exhibit D.

67.     DSIC did not respond to Archer's Bond Claim pursuant to its options under Paragraph 4 of the Bond by July 25, 2014, its fifteen (15) day deadline.

68.     DSIC did not respond to Archer's Bond Claim pursuant to its options under Paragraph 4 of the Bond until October 16, 2014, whereby DSIC denied Archer's Bond claim. DSIC's denial letter, Exhibit F.

69.     As a result of DSIC's failure to timely abide by Paragraph 4 of the Bond, and also pursuant to Article 8.1 of the Subcontract, Archer was entitled to perform Prince's remaining Subcontract Work and correct Prince's non-conforming Work, and charge the cost thereof to the Subcontractor  who shall be liable for the payment of same including reasonable overhead and profit. *See* Subcontract, §8.1, Exhibit A.

70.     DSIC is liable for such costs Archer incurred for performing Prince's remaining Subcontract Work, and correcting Prince's non-conforming Subcontract Work pursuant to Section 6(a) of the Bond which states, "the surety shall be liable for the responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work." See Bond, §6(a), Exhibit B.

71.     As a result of DSIC's failure to timely abide by Paragraph 4 of the Bond, and also pursuant to Article 8.1 of the Subcontract, Archer was entitled to contract with a replacement contractor to perform Prince's remaining Subcontract Work and correct Prince's non-conforming Work, and charge the cost thereof to the Subcontractor who shall be liable for the payment of same including reasonable overhead and profit. *See* Subcontract, §8.1, Exhibit A.

72.     DSIC is liable for such costs Archer incurred for hiring a replacement contractor to perform Prince's remaining Subcontract Work, and correct Prince's non-conforming

Subcontract Work pursuant to Section 6(a) of the Bond which states, "the surety shall be liable for the responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work." See Bond, §6(a), <u>Exhibit B</u>.

73.     Archer hired a replacement subcontractor and used its own efforts to remediate Prince's default of the Subcontract.

74.     Archer incurred reimbursable costs and expenses in the amount of $631,148.65 to remediate Prince's default of the Subcontract.

75.     The Bond provides that the DSIC agreed to be liable for, among other things, the following: (1) correction of Prince's defective or incomplete Subcontract work; (2) legal and design costs result from or arising from Prince's default, or resulting or arising from the actions or failure to act of the DSIC under Paragraph 4 of the Bond; and (3) liquidated and delay damages. See Bond, ¶6, <u>Exhibit B</u>.

76.     In a letter dated August 29, 2016, after the remediation of Prince's default was complete through the use of Archer's replacement subcontractor and its own efforts, Archer requested reimbursement in the amount of $631,148.65 from DSIC for Archer's costs incurred to remediate Prince's default of the Subcontract. See Archer's August 29th Letter, <u>Exhibit G</u>.

77.     To date, DSIC has failed to reimburse Archer any monies related to its Bond Claim.

78.     Despite Archer's written demands, DSIC has breached the Bond by (1) failing to timely respond in accordance with Paragraph 4 of the Bond; and (2) failing to reimburse Archer for costs incurred in remediating Prince's default of the Subcontract.

79.     Archer has been damaged by DSIC's material breach of the Bond in the amount of $631,148.65, plus other costs and expenses, including attorneys' fees and interest, which

Archer will continue to accrue throughout the instant lawsuit. See Bond, ¶7, <u>Exhibit B</u>.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant, ARCHER WESTERN CONTRACTORS, LLC, prays that the Court enter an order providing the following relief:

(i)      Declare that DSIC breached the Bond.

(j)      Enter judgment against Developers Surety & Indemnity Company in favor of Archer in the amount of Archer's damages in the amount of $631,148.65, plus all cost and expense, including attorneys' fees and interest pursuant to the Subcontract and Bond, and Fla. Stat. 624.428, 627.756, 255.05, and/or 255.071, in the amount that Archer has and will incur, and any other amounts proven at trial; and

(k)      For such additional relief as this Court deems equitable and just.

**DATED** this 12thday of December, 2016.

Respectfully submitted,

**WATT TIEDER HOFFAR & FITZGERALD**

By:  _/s/ Mariela M. Malfeld_____
     Mariela M. Malfeld
     Florida Bar No.: 53084
     1200 Brickell Avenue, Suite 1950
     Miami, Florida 33131
     Phone: (305) 777-3572
     Facsimile: (786) 693-7797
     mmalfeld@watttieder.com

*Attorneys for Archer Western Contractors, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing was served upon the following pursuant to the Federal Rules of Civil Procedure on this the 12th day of December 2016.

Edward Etcheverry, Esq.
Jeffrey S. Geller, Esq.
**ETCHEVERRY HARRISON LLP**
150 South Pine Island Road, Suite 105
Ft. Lauderdale, FL 33324
Phone: (954) 370-1681
Fax: (954) 370-1682
etcheverry@etchlaw.com
geller@etchlaw.com

***Attorney for Plaintiff DSIC***

_/s/ Mariela M. Malfeld_
Mariela M. Malfeld