**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DEVELOPERS      SURETY      AND
INDEMNITY COMPANY,

          Plaintiff,

v.                                                    Case No:  6:16-cv-1875-Orl-40KRS

ARCHER WESTERN CONTRACTORS,
LLC,

          Defendant.
_____/

## <u>ORDER</u>

This cause is before the Court on the following:

1.  Defendant Archer Western Contractors, LLC's Motion for Summary Judgment (Doc. 82), filed October 2, 2017;

2.  Plaintiff Developers Surety and Indemnity Company's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 92), filed November 20, 2017;

3.  Defendant's Reply in Support of Motion for Summary Judgment (Doc. 112), filed December 20, 2017;

4.  Plaintiff's Motion for Summary Judgment (Doc. 96), filed November 20, 2017;

5.  Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 111), filed December 20, 2017; and

6.  Plaintiff's Reply in Support of Its Motion for Summary Judgment (Doc. 115), filed January 9, 2018.

On April 13, 2018, the Court requested supplemental briefing regarding the application of Paragraph 6 of the Performance Bond. (Doc. 125). The parties both briefed the issue. (Docs. 126, 127). With briefing complete, the Court is fully advised on the premises. Upon consideration and review of the record as cited by the parties in their respective briefs, Plaintiff Developers Surety Insurance Company's motion is due to be denied, and Defendant Archer Western Contractors, LLC's motion is due to be granted.

## I.     BACKGROUND

This case arises out of a subcontract agreement gone wrong. In February 2012, Archer Western Contractors, LLC ("Archer") entered into a contract with the Florida Department of Transportation to work on the Central Florida Commuter Rail Transit Station Finishes Project (the "Sunrail Project"). (Doc. 82-5, p. 2).

In May 2012, Archer entered into a Subcontract Agreement (the "Subcontract") with Prince Land Services, Inc. ("Prince"), which required Prince, as subcontractor, to perform landscaping and irrigation work on the Sunrail Project. (Doc. 82-8, p. 2). On September 7, 2012, Developers Surety and Indemnity Company ("DSIC"), as surety, issued Subcontractor Performance Bond No. 504957P (the "Bond"). (Doc. 82-11). The Bond listed Prince as subcontractor, DSIC as surety, and Archer as obligee. (*Id.*). This case centers on the parties' rights and obligations vis-à-vis the Subcontract and Bond.

By May 2014, disputes arose relating to Prince's performance under the Subcontract, eventually leading to Archer defaulting Prince. (Docs. 120, 121). Archer thereafter engaged a third party to make up for Prince's alleged shortcomings. After obtaining a June 19, 2014, proposal from LaFleur Nurseries & Garden Center ("LaFleur"), Archer retained LaFleur to perform limited landscaping services at the Sanford, Florida,

Sunrail station on June 28, 2014.[1] (Docs. 82-17, 82-18). After Prince defaulted, LaFleur and Archer entered into a replacement subcontract (the "LaFleur Subcontract"), whereby LaFleur was hired to complete the work originally subcontracted to Prince. (Doc. 82-10). LaFleur and Archer exchanged communications regarding drafts of the proposed subcontract and pricing between July 14, 2014, and July 22, 2014. (Docs. 82-26, through 82-30). LaFleur signed the LaFleur Subcontract on July 25, 2014; Archer signed on July 29, 2014. (Doc. 82-10).

In the weeks before the LaFleur Subcontract was executed, Archer notified Prince and DSIC of its default. On July 3, 2014, Archer emailed Prince a "Notice of Default" letter, notifying Prince of numerous alleged failures of performance, which put Prince in default on the Subcontract. (Doc. 82-21). The Notice further instructed that if Prince did not cure the default within seventy-two hours, Archer would "take whatever steps it deems necessary to mitigate the damages caused by Prince's default." (*Id.* at p. 3).

On July 9, 2014, Archer sent DSIC a letter making a claim on the Bond ("Bond Claim") after Archer's default. (Doc. 82-24). DSIC received the Bond Claim on July 10, 2014. (Doc. 120, ¶ 16). In response, DSIC sent Archer a July 14, 2014, letter stating that the Bond Claim lacked sufficient documentation of Prince's alleged deficiencies and requesting more information. (Doc. 82-31). DSIC's July 14, 2014, letter also indicated that DSIC had "commenced a preliminary investigation," and advised that DSIC would formally respond to Archer's claim "within fifteen (15) calendar days of receipt of the

---

[1]  Archer characterizes the work LaFleur performed in June 2014 as "clean-up," which Archer was entitled to obtain pursuant to the Subcontract, Section 6.4. (Doc. 121, ¶ 41).

[requested] documents." (*Id.*). Thereafter, Archer and DSIC did not communicate for months.

After learning of the LaFleur Subcontract, DSIC sent Archer a letter dated October 16, 2014, stating that the Bond was null and void due to Archer's (1) failure to provide the documentation requested by DSIC's July 14, 2014, letter, and (2) unauthorized, unilateral decision to replace much of the work performed by Prince under the Subcontract. (Doc. 83-32). The letter also avers that Archer's actions to replace Prince's Subcontract performance interfered with DSIC's rights under the Bond to mitigate damages caused by default. (*Id.*). Accordingly, DSIC formally denied Archer's Bond Claim. (*Id.*).

Upon completing its work on the Sunrail Project, Archer sent DSIC a letter dated August 29, 2016, demanding DSIC reimburse Archer $631,148.65—the cost to replace Prince's work—pursuant to the Bond. (Doc. 83-33).

## A. Surety and Bond Provisions

The interplay between the Bond and Subcontract is critical to the question of whether either party breached their contractual obligations. The Subcontract set forth the following default protocol:

### ARTICLE 8 – RECOURSE BY CONTRACTOR

**8.1 Failure of Performance and Default.** If the Contractor [Archer] determines at Its sole discretion that the Subcontractor [Prince] has: (i) refused or failed to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work; (ii) failed to make prompt payment for, or failed to prevent claims of non-payment from, Its workers, subcontractors or suppliers of any tier; (iii) disregarded Laws or orders of any public authority having jurisdiction; or (iv) otherwise materially breached, a provision of this Agreement; and Subcontractor fails within seventy-two (72) hours after receipt of written notice (facsimile, email, or letter, shall constitute sufficient written notice and declaration of default) to commence and continue satisfactory correction of such default with diligence and promptness, the Contractor, without prejudice to any other

rights or remedies, shall have the right to any or all of the following remedies: (i) supply such number of workers and quantity of materials, equipment and other facilities as the Contractor deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of same including reasonable overhead, profit and attorney's fees; (ii) contract with one or more additional contractors to perform such part of the Subcontractor's Work as the Contractor shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor who shall be liable for the payment of same including reasonable overhead and profit; (iii) discharge the claim of non-payment; and/or (iv) withhold payment of any moneys due the Subcontractor pending corrective action to the extent required by and to the satisfaction of the Contractor, Owner and the Architect/Engineer. Any costs incurred by Contractor under this article, including attorney fees, shall be deducted from funds otherwise due Subcontractor under this Agreement. Contractor may use any materials, implements, equipment, appliances or tools furnished by or belonging to the Subcontractor to complete the Subcontractor's Work. Subcontractor shall provide its surety with all notices, letters, or email, from the Contractor referred to in this paragraph. In the event of an emergency affecting the safety of persons or property, the Contractor may proceed as outlined above without notice.

. . . .

**8.2 Failure of Performance-Termination for Default by Contractor.** If the Subcontractor fails to commence and satisfactorily continue correction of a default within seventy-two (72) hours after the notice is issued under Paragraph 8.1, then the Contractor may, in lieu of or in addition to the remedies provided therein, terminate this Agreement or a portion thereof, and use any materials, implements, equipment, appliances or tools furnished by or belonging to the Subcontractor to complete the Subcontractor's Work. The Contractor also may furnish those materials, equipment and/or employ such workers or subcontractors as the Contractor deems necessary to maintain the orderly progress of the work.

In the event of Termination for Default, Subcontractor shall receive no further payment of any unpaid portion of the Subcontract Price until such time as the Subcontract Work is completed, at which time Subcontractor will be entitled to the unpaid portion of the Subcontract Price, less all of the costs incurred by the Contractor in so performing the Subcontractor's Work, including reasonable overhead, profit, liquidated or consequential damages, and attorney's fees, which shall be deducted from any moneys due or to become due the Subcontractor. The Subcontractor and its surety

shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Amount.

(Doc. 10-1, ¶¶ 8.1–8.2). The Bond outlines four alternative responses DSIC was authorized to undertake upon notice of Price's default:

> 4. Whenever Obligee [Archer] has declared Subcontractor [Prince] to be **IN DEFAULT OF THE SUBCONTRACT**, the Surety [DSIC] shall, within fifteen (15) calendar days of its receipt of notice from Obligee that Subcontractor is in default, respond as follows:
>
>> a. Complete the Subcontract Work in accordance with the Subcontract terms and conditions; or
>>
>> b. Obtain bids or offers from contractors acceptable to Obligee for completing the Subcontract in accordance with its terms and conditions, and upon determination by Obligee and the Surety jointly of the lowest responsible bidder or offeror, arrange for a subcontract between such completion contractor and the Obligee, and arrange for new performance and payment bonds for such completion contractor from a surety acceptable to the Obligee. Upon acceptance of the completion contractor by the Obligee, the Surety shall pay to the Obligee the difference between the cost to complete the Subcontract work and the balance of the Subcontract Price, including the cost of obtaining new performance and payment bonds; or
>>
>> c. Tender to Obligee the penal sum of the Bond less any amounts expended by the Surety in financing the Subcontractor pursuant to Paragraphs 3, or 4(e) hereof.
>>
>> d. Having made an independent investigation of the facts and circumstances of the alleged default, deny its liability in whole or in part and notify and explain to the Obligee the reasons why the Surety believes it does not have liability for the default, in which event Obligee may proceed to take such action as may be allowed under the Subcontract or at law and the Surety's liability shall be determined in accordance with Paragraph 10 hereof.

(Doc. 10-2, ¶ 4).[2]

---

[2] Section 4(e) of the Bond, though not now relevant, sets forth a procedure for DSIC to obtain an extension of time to respond to a default. (*Id.* at p. 2).

The Bond also provided the following provision imposing liability on DSIC for liabilities Prince may incur for the completion or correction of its Subcontract work:

6. The Surety [DSIC] shall be liable for:

    a. The responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work.

    . . . .

    d. The Surety's liability under this Paragraph 6 shall not exceed, in the aggregate, the penal sum set forth on the cover page of this Bond, subject to Paragraph 2.

(Doc. 10-2, ¶ 6).

Finally, the Bond explicitly incorporated the Subcontract by reference. (Doc. 10-2, p. 1).

## B. Claims at Issue

On November 16, 2016, DSIC filed its Amended Complaint seeking a declaratory judgment that: (1) Archer breached the Bond by unilaterally completing the Subcontract; (2) DSIC has no obligations to Archer under the Bond; and (3) the Bond is null and void. (Doc. 10). Thereafter, Archer filed its Answer to Plaintiff's Amended Complaint, Affirmative Defenses, and Counterclaim against DSIC. (Doc. 14). Archer's Counterclaim asserts two counts. Count I seeks a declaration that: (1) DSIC breached the Bond; (2) pursuant to the Subcontract and Bond, Archer was authorized to hire a replacement subcontractor and remediate Prince's default; (3) DSIC is liable to Archer for the cost of remediating Prince's default; and (4) DSIC is liable to Archer for $631,148.65, plus fees and costs. (*Id.*). Count II asserts a breach of contract claim based on DSIC's alleged breach of the Bond. (*Id.*). The parties have filed cross motions for summary judgment.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, No. 16-17450, 2017 WL 3207125, at *2 (11th Cir. July 28, 2017) (per curiam) (holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating the absence of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). In determining whether a genuine dispute of material fact exists, the court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III.    DISCUSSION

A performance bond, like the Bond at issue here, is a contract, and is thus subject to the general law of contracts. *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 197 (Fla. 1992).[3] "It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990). Moreover, courts must "read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000); *see also CC-Aventura, Inc.*

---

[3]    In a diversity action, a district court applies the substantive law of the forum in which it sits; in this case, Florida law applies. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Where the language of a contract is unambiguous, "the construction of the contract presents a question of law." *Fernandez v. Homestar at Miller Cove, Inc.*, 935 So. 2d 547, 550 (Fla. 3d DCA 2006).

*v. Weitz Co.*, 492 F. App'x 54, 56 (11th Cir. 2012) (per curiam). Performance bonds are designed "to guarantee the completion of the contract upon default by the contractor." *Larkin*, 593 So. 2d at 198. "[T]he surety's liability for damages is limited by the terms of the bond. Florida courts have long recognized that the liability of a surety should not be extended by implication beyond the terms of the contract, i.e., the performance bond." *Larkin*, 593 So. 2d at 198 (citation omitted).

Both parties move for summary judgment on their respective requests for declaratory judgments.

### A.    DSIC's Motion for Summary Judgment

DSIC argues that Archer breached the Bond by (i) unilaterally taking action to replace Prince's performance, and (ii) by stymying DSIC's efforts to mitigate damages. First, DSIC contends that Archer breached the Bond by engaging LaFleur as a replacement subcontractor during DSIC's damage mitigation period. Under the Bond, DSIC asserts, Archer was precluded from taking "any 'action as may be allowed under the Subcontract' unless and until DSIC elected option 4 to deny AWC's claim." (Doc. 96, p. 2). Rather than sit on the sidelines, Archer unilaterally engaged a replacement subcontractor (LaFleur) to remedy and complete Prince's work before DSIC had a chance to take action under the Bond to mitigate damages. (*Id.* at pp. 2–5). DSIC asserts that Archer's actions thus precluded DSIC from taking one of the corrective actions enumerated in Paragraph 4 of the Bond. (*Id.*). Second, DSIC avers that Archer's failure to supply documentation supporting Prince's alleged breach constituted a breach of the implied covenant of good faith and fair dealing, thus voiding the Bond. (*Id.* at pp. 10–12).

Archer submits that it retained LaFleur to replace Prince's work under the Subcontract *only after* DSIC failed to take action under Paragraph 4 of the Bond within the fifteen-day time limit. (Doc. 111, p. 8). Before DSIC's time-to-respond deadline passed, Archer only retained LaFleur to perform "clean-up" work, which was specifically authorized by Paragraph 6.4 of the Subcontract.[4] (Doc. 111, pp. 8–9). Further, Archer contends there is no record evidence demonstrating DSIC's awareness that Archer had "taken steps" to allow LaFleur to complete Prince's defaulted work, thus DSIC could not have been "prevented" from taking action under the Bond. (*Id.* at p. 9). Finally, Archer asserts that it had no obligation under the Bond to provide the extensive documentation requested by DSIC to support Prince's default. (*Id.* at pp. 18–20).

> 1. *Archer Did Not Breach the Bond by Retaining LaFleur to Perform Clean-up Work or by Negotiating With LaFleur During DSIC's Election Period*

The Court first addresses DSIC's argument that Archer breached the Bond by unilaterally completing Prince's Subcontract Work. (Doc. 96, p. 3).

---

[4] Paragraph 6.4 provides:

> The Subcontractor shall follow the Contractor's clean-up directions and at all times keep the Project and site free from debris resulting from the Subcontractor's Work, store material and equipment in an orderly manner, and broom clean each floor area prior to discontinuing work in that area. If the Subcontractor fails to commence clean-up duties within 24 hours after receipt from the Contractor of written notice of noncompliance, the Contractor may implement clean-up measures without further notice and deduct the cost plus reasonable overhead and mark-up thereof from any amounts due or to become due the Subcontractor.

(Doc. 10-1, ¶ 6.4).

The parties sharply dispute the law bearing on this issue. DSIC first cites *International Fidelity Insurance Co. v. Americaribe-Moriarty JV*, 681 F. App'x 771 (11th Cir. 2017). In *Americaribe*, the U.S. Court of Appeals for the Eleventh Circuit affirmed the district court's grant of summary judgment in favor of Fidelity. 681 F. App'x at 777. The facts of *Americaribe* are similar to the facts of this case. There, Fidelity was surety on a performance bond issued for a subcontract between Americaribe, the general contractor, and CPM, the subcontractor. *Id.* at 772. The subcontract and performance bond obligated Americaribe to give Fidelity notice and a grace period before both (i) terminating the subcontract and (ii) triggering Fidelity's bond obligations. *Id.* at 772–73. Notwithstanding its notice obligations, Americaribe engaged a replacement contractor, Dillon, who performed substantial work to remedy CPM's defaulted performance before notifying Fidelity of CPM's default.[5] The Eleventh Circuit found that Americaribe's "immediate hiring of Dillon to complete the project and the costs Dillon incurred completing CPM's work thwarted Fidelity's ability to choose among the options it had for remedying CPM's default under . . . the bond." *Id.* at 776–77.

For starters, *Americaribe*'s holding is applicable here only if Archer's retention of LaFleur during the notice period in some way "thwarted [DSIC's] ability to choose among the options it had for remedying [Prince's] default." *See id.* LaFleur's operations

---

[5] The bond in *Americaribe* guaranteed "Fidelity seven-days notice before it could enforce other remedies," within which time Fidelity could choose various actions to mitigate its damages. *Id.* at 773. And although Fidelity received this notice starting the seven-day clock on October 1, 2015, Americaribe had by that time engaged a replacement contractor. *Id.* at 774. Importantly, Americaribe paid Dillon hundreds of thousands of dollars on invoices predating the October 1, 2015, notice for work to remediate and complete CPM's defaulted work. *Id.* at 776.

performed *before the notice deadlines elapsed* are distinguishable to those performed by

Dillon in *Americaribe*. In *Americaribe*, Dillon, the replacement subcontractor, performed

work squarely within CPM's scope of work both before and during Fidelity's damage

mitigation period. Moreover, for this work, Dillon was paid $1,465,817.73 on invoices

bearing dates that preceded notice to Fidelity. And though some of these funds were

issued for the payment of other contractors, the Eleventh Circuit noted that roughly half

were paid for CPM's work that was squarely within the defaulted subcontractor's scope

of work. 681 F. App'x at 776.

Conversely, in this case, there is no evidence supporting DSIC's contention that

the work LaFleur performed before DSIC's mitigation period ended was within Prince's

original scope of work. Archer asserts that before DSIC's mitigation period lapsed,

LaFleur only performed "cleanup" work authorized under Article 6.4 of the Subcontract.

(Doc. 111, p. 11). According to LaFleur's June 30, 2014, invoice, LaFleur billed Archer

$5,375 for work described as "Maintenance includes dump fee for the cleaning of the

landscape at the Sunrail station in Sanford, FL on 6/28/2014." (Docs. 82-17, 82-18).[6] The

value of the LaFleur Subcontract—signed after DSIC's fifteen-day mitigation period under

the Bond—was $343,797.13. (Doc. 82-10, p. 2). Considering (i) the price difference

between LaFleur's June 2014 work and the LaFleur Subcontract, and (ii) the descriptions

of LaFleur's June 2014 work from the proposal and invoice, these services fit the

description of clean-up work authorized under the Subcontract. Furthermore, there is no

---

[6] LaFleur's June 19, 2014, proposal describes the work to be performed by LaFleur as "cleanup of all beds, mowing of retention ponds, disposal of all debris, pulling weeds, herbiciding of landscape beds, trimming of palms, edging and blowing of landscaped areas." (Doc. 82-17).

evidence that LaFleur's limited clean-up operations during DSIC's notice period, or the costs LaFleur incurred during this period, "thwarted [DSIC's] ability to choose among the options it had for remedying [Prince's] default." *Americaribe* therefore does not compel the Court to find that Archer breached the Bond by engaging LaFleur.

DSIC next cites two more obligee-failure-to-notify-surety cases to advance its argument: *Insurance Co. of North America v. Metropolitan Dade County*, 705 So. 2d 33 (3d DCA 1997), and *Dragon Construction, Inc. v. Parkway Bank & Trust*, 678 N.E.2d 55 (Ill. App. Ct. 1997). Both are easily discarded.

In *Insurance Co.*, the contractor failed to notify its surety of the bonded subcontractor's default. 705 So. 2d at 34. Instead, the contractor hired a replacement subcontractor whose work began more than a year before, and was completed approximately six months before, the surety was notified. *Id.* at 35. The performance bond at issue required that the surety be notified of a default so it could either complete the work itself or take part in the process of selecting a replacement contractor. *Id.* at 35. The surety therefore had no opportunity to mitigate damages itself (or participate in selecting a replacement contractor), only being apprised of the defective work after such work had been repaired. *Id.* (holding the obligee's "failure to comply with the . . . bond's notice provisions stripped the surety of its bargained for right and relieved the surety of its liability for the instant claim"). The circumstances in *Dragon* were similar, though less egregious. There, the surety was notified of the subcontractor's defective performance pursuant to the bond after a replacement contractor had been retained to complete the original subcontractor's work. The replacement's hiring contravened the bond, which mandated

seven days' notice and surety participation in selecting a replacement. 678 N.E.2d at 56–58.

Here, DSIC received notice of Prince's default pursuant to the Subcontract and the Bond. Further, the replacement LaFleur Subcontract was not signed (and *replacement* work did not begin) until after the mitigation periods specified in the Subcontract and Bond elapsed. Applying the supplied precedent to our facts therefore does not establish that Archer's notice was deficient or breached the Bond. The remaining precedent cited by DSIC (to advance its argument that the hiring of LaFleur voided the Bond) are likewise unavailing. (*See* Doc. 96, pp. 8–10).

To the extent DSIC argues that *Americaribe* and its antecedents are determinative on this issue, the Court disagrees. A few more facts should be distinguished before moving on. DSIC claims that Archer replaced Prince's performance before DSIC's election period ended, as evidenced by: (i) the Statement of Laini Schultz (Doc. 82-4, ¶ 38); (ii) email correspondence between Laini Schultz and a LaFleur principal (Doc. 82-26); and (iii) the July 2, 2014, "Date of Agreement" stated on the LaFleur Subcontract (Doc. 82-10, ¶ 2). (Doc. 96, p. 6; Doc. 97, ¶¶ 12–13, 23). These facts fail to support DSIC's conclusion that LaFleur was hired to replace Prince during DSIC's election period. First, the statement of Laini Schultz only establishes that Archer was making preparations to retain LaFleur as Prince's replacement subcontractor in the days preceding the expiration of DSIC's election period. (Doc. 82-4, ¶¶ 38–42). Archer did not execute the contract until DSIC's election period terminated, and did not "allow LaFleur to commence its work on the Project sites until after the 15-calendar day deadline for DSIC to respond under Paragraph 4 of the Bond first expired, with said expiration occurring on July 25, 2014."

(*Id.* ¶ 42). Second, the email correspondence between Laini Schultz and Michelle LaFleur, a LaFleur principal, merely evidence that the parties were sharing draft subcontracts with each other and otherwise negotiating the (*still prospective*) deal. (Doc. 82-26). Third, although the LaFleur Subcontract is dated July 2, 2014, the contract was executed by LaFleur on July 25, 2014, and Archer on July 29, 2014. (Doc. 82-10, pp. 2–3). And the record is devoid of evidence that LaFleur commenced its *replacement* work before DSIC's mitigation period expired.

In sum, DSIC fails to identify authorities that support its position that Archer's preliminary negotiations with LaFleur—taken to ensure timely completion of the Sunrail Project in the event DSIC failed to act under the Bond to remedy Prince's defaulted work within its fifteen-day window—breached the Bond. Contrary to DSIC's contentions, Archer was not precluded from vetting a replacement subcontractor to hire (to ensure swift completion of the subcontracted work) if DSIC failed to rectify Prince's default. These preparations turned out to be wise given DSIC's ultimate failure to correct Prince's default.

### 2. Archer Did Not Breach the Bond by Failing to Supply DSIC Information Documenting Prince's Alleged Breach

The Court next turns to DSIC's assertion that Archer breached the Bond by "keep[ing] DSIC in the dark while AWC arranged for the completion of the *Subcontract*[.]" (Doc. 96, p. 10). DSIC contends that it was entitled to make its decision "[h]aving made an independent investigation of the facts and circumstances of the alleged default," but Archer breached its implied duty of good faith and fair dealing by failing to timely provide DSIC with documentation of Prince's default. (*Id.* at pp. 10–12). Central to this argument is the premise is that Archer was obligated "to cooperate with the contractually provided

right of DSIC to investigate" Prince's alleged default. (*Id.* at p. 11). Conversely, Archer asserts that neither the Subcontract nor the Bond imposed a duty on Archer to assist DSIC with its "independent investigation." (Doc. 111, pp. 18–20). The Court agrees with Archer.

After receiving notice on July 10, 2014, that Prince was in default (Doc. 82-24), DSIC responded by sending Archer a letter dated July 14, 2014, requesting additional documentation that "would provide the details of the alleged deficiencies in the materials furnished and work performed by [Prince]." (Doc. 82-31). The letter also requested a meeting, and stated, "Pursuant to the terms of the *Bond*, DSIC shall respond to AWC's purported declaration of default against PLS within fifteen (15) calendar days of receipt of the [requested] documents." (*Id.*). Archer did not respond to DSIC's July 14, 2014, letter or to the letter DSIC sent Archer on July 18, 2014, reiterating the requests for documentation and to meet. (Doc. 97).

"Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract." *Burger King v. Weaver*, 169 F.3d 1310, (11th Cir. 1999). Archer emphasizes that, in contracts concerning construction, "an owner has . . . an implied obligation not to do anything to hinder or obstruct performance by the other person, [and] an implied obligation not to knowingly delay unreasonably the performance of duties assumed under the contract . . . ." (Doc. 96, pp. 11–12 (quoting *Champagne-Webber, Inc. v. City of Ft. Lauderdale*, 519 So. 2d 696, 697–98 (Fla. 4th DCA 1988))). However, the "implied obligation of good faith cannot be used to vary the terms of an express contract." *City of Riviera Beach v. John's Towing*, 691 So. 2d 519, 521 (Fla. 4th DCA 1997).

Archer did not breach its implied duty of good faith and fair dealing by neglecting to provide documentation to DSIC demonstrating Prince's alleged default. Paragraph 4 of the Bond simply required Archer to give DSIC notice that Prince was in default to trigger DSIC's obligation to take one of several enumerated corrective actions within fifteen days. (Doc. 10-2, ¶ 4). Archer does not identify a Bond provision requiring Archer to append documentation to its notice of default or perform an investigation for DSIC. To the contrary, Paragraph 4, Subparagraph (d) of the Bond contemplates an "independent investigation of the facts and circumstances of the alleged default" by DSIC. (Doc. 10-2, ¶ 4(d)). Accordingly, Archer did not "knowingly delay unreasonably the performance of duties assumed under the [Bond]" when it failed to provide DSIC documentation supporting Prince's default, because Archer never assumed such a duty. Archer took no action preventing DSIC from completing an "independent investigation"—and DSIC may not now void the Bond because Archer refused to gratuitously investigate on DSIC's behalf.

For the foregoing reasons, DSIC's Motion for Summary Judgment is due to be denied. The remaining sections of DSIC's summary judgment motion raise counterarguments to Archer's Motion for Summary Judgment, and are addressed below.

### B.    Archer's Motion for Summary Judgment

As noted above, Archer moved for summary judgment on its counterclaims, seeking a declaratory judgment that DSIC breached the Bond and is liable for the costs

Archer incurred to remediate Prince's defaulted work. (Doc. 82, p. 4).[7] Archer's motion is due to be granted.

### 1. DSIC is Liable to Archer Under the Bond and Subcontract

Archer acted in accordance with the Subcontract and the Bond at every stage, while DSIC's conduct breached the Bond. After numerous alleged problems with Prince's performance, Archer notified Prince on July 3, 2014, that it was in default in accord with Paragraph 8.1 of the Subcontract.[8] Prince did not remedy its default. Importantly, Archer's use of the default procedure prescribed by Paragraph 8.1 of the Subcontract was "without prejudice to any other rights or remedies" set out elsewhere in the Subcontract and/or Bond. (Doc. 10-1, ¶ 8.1).

Archer was therefore acting within its rights when, on July 9, 2014, Archer sent DSIC a Bond Claim, notifying DSIC of Prince's default, and triggering DSIC's obligations under Paragraph 4 of the Bond.[9] Upon receipt of the Bond Claim, DSIC was obligated to take one of the corrective actions specified by Paragraph 4 of the Bond. Instead, DSIC

---

[7] Archer does not move for summary judgment on the issue of damages, and instead "defers the exact determination of the amount(s) of its damages to the discovery and trial phases of the above-referenced litigation. (*Id.* at p. 1 n.1).

[8] Paragraph 8.1 provides, in pertinent part: "If the Contractor [Archer] determines *at Its sole discretion* that the Subcontractor [Prince] has" materially breached the Subcontract, and Prince fails to remedy its breach within seventy-two hours of receiving written notice of said breach, "the Contractor [Archer], *without prejudice to any other rights or remedies*, shall have the right to" remedy the breach itself or by contracting with additional subcontractors, and may discharge payments due to Prince or withhold payments to Prince pending corrective action. (Doc. 10-1, ¶ 8.1). Paragraph 8.1 also obligated Prince to forward its notice of default to DSIC, its Surety. (*Id.*).

[9] DSIC received the Bond Claim on July 10, 2014.

sent communications to Archer requesting additional information regarding Prince's alleged default. As discussed above, Archer was not obligated to provide DSIC the requested documents.[10] Because DSIC failed to take one of the required actions prescribed by Paragraph 4 of the Bond in response to Archer's Notice of Default, DSIC breached the Bond.[11]

Finally, Archer's execution of the LaFleur Subcontract and eventually charging DSIC for LaFleur's work were authorized by the terms of the Bond and Subcontract.[12] This conclusion is reached after reading the Bond and Subcontract in harmony, as required by Florida law. *See City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000). First, Paragraph 8.1 of the Bond clearly authorized Archer to hire LaFleur to complete Prince's unfinished work after Prince defaulted.[13] The same section authorized Prince to

---

[10] Though DSIC claims that Archer's silence precluded DSIC from investigating the circumstances of Prince's default, the Court disagrees. Prince was obligated under Paragraph 8.1 of the Subcontract to provide DSIC with the July 3, 2014, Notice of Default. (Doc. 10-1, ¶ 8.1 ("Subcontractor [Prince] *shall* provide its surety with all notices, letters, or email, from the Contractor referred to in [Paragraph 8.1 of the Subcontract].")). Along with the Notice of Default, Archer sent Prince on July 3, 2014, several attachments documenting myriad alleged defaults in Prince's performance. (Docs. 82-20 through 82-23). It is not clear what went wrong with DSIC's "independent investigation," but it is clear that the Bond did not require Prince to perform an investigation on DSIC's behalf (*see* Section III.A.2, *infra*), and voluminous documentation regarding the alleged breach was in the possession of Prince—who was contractually obligated to forward said information to DSIC.

[11] Paragraph 4's use of the word "shall" establishes that DSIC was *required* to take corrective action in response to receipt of the Bond Claim. (Doc. 10-2, ¶ 4).

[12] Because the Bond incorporated the Subcontract by reference (Doc. 10-2, p. 1), the Court construes the Subcontract to be "part of the [Bond]." *See OBS Co. v. Pace Const. Corp.*, 558 So. 2d 404, 406 (Fla. 1990).

[13] Specifically, because Prince failed to remedy its default within seventy-two hours of receiving the Notice of Default, Archer had the right to "contract with one or more additional contractors [LaFleur] to perform such part of [Prince's] Work as [Archer] . .

"charge the cost thereof *to the Subcontractor* who shall be liable for the payment of same

. . . ." *Id.* (emphasis added). Although Subcontract Paragraph 8.1 states that Prince shall

be liable for the cost of remedying Prince's faulty work, Bond Paragraph 6(a) imposes this

same liability on DSIC. (Doc. 10-2, ¶ 6(a)). Specifically, Paragraph 6(a) states: "Surety

[DSIC] shall be liable for [t]he responsibilities of the Subcontractor [Prince] for correction

of defective work and completion of the Subcontract Work."[14] (*Id.*).

The Court concludes that, pursuant to the Subcontract and Bond, DSIC is liable

for the cost of correcting Prince's defective work and completing the Subcontract. *See

Johnson*, 760 So. 2d at 84 (stating "the rule of construction requiring courts to read

provisions of a contract harmoniously in order to give effect to all portions thereof."); *see

also CC-Aventura, Inc. v. Weitz Co.*, 492 F. App'x 54, 56 (11th Cir. 2012) (per curiam)

(noting that Florida law requires courts to read "all the language in the relevant *documents*

. . . harmoniously in order to give effect to all provisions" (emphasis added)); *OBS Co.*,

558 So. 2d at 406.

Because neither party discussed Bond Paragraph 6 in their initial summary

judgment briefing, the Court directed the parties to brief whether, under the

circumstances, DSIC is liable for the costs Archer incurred to remediate Prince's default

pursuant to Bond Paragraph 6(a) and Subcontract Paragraph 8.1. (Doc. 125).

Unsurprisingly, Archer said yes and DSIC said no. (Docs. 126, 127).

---

. determine[d would] provide the most expeditious completion of the total Work . . . ." (Doc. 10-1, ¶ 8.1).

[14] Paragraph 6(d) of the Bond limited DSIC's potential liability under the preceding subsections of Paragraph 6 to "the penal sum set forth on the cover page of th[e] Bond:" $710,895.93. (Doc. 10-2).

DSIC's objections to liability under these provisions are without merit. First, DSIC argues that Archer waived its rights under Subcontract Paragraph 8.1 to hire a replacement contractor by first seeking to enforce its rights under the Bond via the Bond Claim. (Doc. 127, pp. 1–2 (citing *State Farm Mut. Auto Ins. Co. v. Yenke*, 804 So. 2d 429, 432 (Fla. 5th DCA 2001))). This argument fails because, to waive a right, the waiving party must have the "intention to relinquish the right." *See Yenke*, 804 So. 2d at 432. Archer's pre-Subcontract negotiations with LaFleur throughout DSIC's mitigation period prove the opposite: Archer intended to retain its right to hire a replacement contractor pursuant to Subcontract Paragraph 8.1 if DSIC failed to take appropriate remedial action within its mitigation period. (*See* Docs. 82-26 through 82-30). Second, DSIC avers that its liability "is limited by the terms of the bond," and it is therefore not liable for the costs Archer incurred to correct Prince's performance pursuant to Subcontract Paragraph 8.1. (Doc. 127, pp. 2–3). This argument also fails because the clear terms of the Bond—specifically Paragraph 6(a)—impose Prince's responsibilities for corrective work upon DSIC. Third, DSIC claims that this construction would "write Paragraph 4 *entirely out of the Bond.*" (Doc. 127, p. 4). This argument might carry greater weight had DSIC been deprived notice under Paragraph 4. However, as discussed more fully above, DSIC received notice of Prince's default and failed to mitigate pursuant to Paragraph 4. Under these circumstances, Archer was permitted to exercise its bargained for rights to replace Prince's work (via Subcontract Paragraph 8.1) and charge its costs-to-correct to DSIC (via Bond Paragraph 6(a)). If the Court adopted DSIC's interpretation, it would be writing Paragraph 6 "*entirely out of the Bond.*" The balance of the objections raised in DSIC's supplemental briefing address issues put to rest elsewhere in this Order.

Although the Court reaches the conclusion advocated by Archer, the Court does not agree with the interpretation of the Subcontract and Bond advanced in Archer's Motion for Summary Judgment (Doc. 82). Archer there suggested the Court utilize the framework applied in *Dooley & Mack Constructors, Inc. v. Developers Surety & Indemnity Co.*, 972 So. 2d 893 (Fla. 3d DCA 2007). (Doc. 82, pp. 9–14). That case is inapposite, however, because of key differences in the operative contracts. Archer's original argument focused on the language of Subcontract Paragraph 8.1 without reference to Bond Paragraph 6(a). A subtle difference between Subcontract Paragraphs 8.1 and 8.2, however, compels the conclusion that DSIC would not be liable for corrective work performed pursuant to Paragraph 8.1 *but for* Bond Paragraph 6(a). Paragraph 8.1 authorizes Archer to charge the cost of corrective work "to the Subcontractor who shall be liable" in the event of Prince's default. (Doc. 10-2, ¶ 8.1). Paragraph 8.2 provides: "The Subcontractor *and its surety* shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Amount." (*Id.* ¶ 8.2 (emphasis added)). The inclusion of "and its surety" in Paragraph 8.2, and exclusion of a similar reference to the surety's obligation to pay in Paragraph 8.1, without more, suggests that DSIC may not be subjected to liability under Paragraph 8.1. Nevertheless, Bond Paragraph 6(a) leaves no room for doubt: "The Surety shall be liable for [t]he responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work." (Doc. 10-2, ¶ 6(a)). Guided by this clear language, the Court is satisfied that DSIC is liable to Archer for Prince's liabilities under Bond Paragraph 8.1 to correct and complete the Subcontract Work.

### 2. DSIC's Remaining Arguments

DSIC's arguments in opposition to Archer's summary judgment motion are futile.

#### a. Prince's Default

First, DSIC argues that genuine issues of material fact exist as to whether Prince defaulted on the Subcontract. (Doc. 92, pp. 4–5). The Court disagrees. Paragraph 8.1 of the Bond authorized Archer to take remedial action if Archer determined, "at Its sole discretion," that Prince materially breached the Subcontract. (Doc. 10-1, ¶ 8.1). Florida law has interpreted "sole discretion" to afford substantial leeway, though it is limited somewhat by the covenant of good faith. *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1184 (11th Cir. 2000). This duty of good faith "limits [Archer's] ability to act capriciously to contravene the reasonable contractual expectations of the other part[ies]." *Dep't of Revenue v. Gen. Motors*, 104 So. 3d 1191, 1198 (Fla. 1st DCA 2012) (quoting *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097–98 (Fla. 1st DCA 1999)). Moreover, this Court has granted summary judgment in similar circumstances. *Sembler Family P'ship #41, Ltd. v. Brinker Fla., Inc.*, 660 F. Supp. 2d 1307, 1313 (M.D. Fla. 2009).

The problems with Prince's performance leading its default by Archer are documented in the affidavit of Laini Schultz and incorporated exhibits. (Doc. 82-4). For instance, on May 2, 2014, the Project Owner sent an email to Archer, complaining that Prince's equipment and materials were blocking parking spaces, and that their workers were not wearing required protective gear. (Doc. 82-15). The Project Owner also began issuing "punch lists"[15] to Archer documenting deficiencies in Prince's performance. (Doc.

---

[15] A punch list is a list of items requiring completion, finishing, corrective, or remedial work under a construction contract.

82-4, ¶ 16; Doc. 82-12). On May 7, 2014, Ms. Schultz received a complaint from an Assistant Project Manager working on the Sunrail Project, alerting her that Prince damaged and dirtied one of the sites in the course of relocating trees. (Doc. 82-16). Archer also cites several May 2014 emails it sent Prince demanding that Prince remedy punch list items and supply necessary reports. (Doc. 82-4, ¶¶ 16–17; Doc. 82-13; Doc. 82-14).

Critically, Archer obtained a Registered Landscape Architect Report (the "Report") authored by Maxwell D. Spann, RLA,[16] assessing Prince's completed work under the Subcontract. (Doc. 82-20, p. 8). Mr. Spann's Report documented significant flaws in Prince's performance:

> Major flaws affecting the health, safety and welfare of future SunRail station patrons in the parking lot area and at ingress egress points, as well as the long term health and maintenance requirements of the installed plant material on site, were observed on the site in all areas; the source and issues regarding these flaws vary widely . . . .
>
> . . .
>
> With regard to the performance specifications, sizes of material, required grade and quality of material, plan details from the professional designing the contract documents, and adherence to the warranty and maintenance period required, the installation in question was found to substantially not meet the standard of practice for landscape material design, installation, and quality.

(Doc. 82-20, p. 12).

Archer also received lengthy punch lists documenting many landscape deficiencies observed at Sunrail Project sites in Debary, Altamonte Springs, Lake Mary, and Sanford, Florida. (Docs. 82-22, 82-23).

---

[16] "Mr. Spann is a Florida-registered landscape architect with over fourteen years of experience in design, construction, and expert witness." (Doc. 82-20, p. 12).

DSIC now claims there exists a fact issue as to whether Prince ever defaulted. In support, DSIC filed an affidavit from Prince's principal stating that Prince complied with its obligations under the Subcontract and there was no basis for Archer to terminate Prince. (Doc. 94-1, ¶¶ 4–9). Moreover, the affiant claims that Archer breached the Subcontract on numerous occasions by failing to: (i) ensure a water and/or power supply at the project site; (ii) maintain the landscaping installed by Prince; (iii) perform necessary change order requests. (*Id.* ¶¶ 10–18). Prince also disputes many of the facts set forth in Archer's Statement of Undisputed Facts (Doc. 82-2, ¶¶ 36, 38, 40–43, 44–46), which purport to justify Archer's termination and default of Prince. (Doc. 94-1, ¶¶ 19–22).

In light of the numerous documented complaints regarding Prince's work, the punch lists documenting same, and Mr. Spann's Report describing deficiencies in Prince's performance, the Court is satisfied that Archer's default of Prince did not violate its duty of good faith. That is, Archer's conduct was not "capricious[]," nor did it "contravene the reasonable contractual expectations of the other part[ies]. *See Gen. Motors*, 104 So. 3d at 1198 (quoting *Cox*, 732 So. 2d at 1097–98). That Archer acted within its "discretion" when it terminated Archer for material breach of the Subcontract is not a genuine issue of material fact foreclosing summary judgment.

b.    *Archer's Alleged Waiver*

DSIC also argues that summary judgment is not appropriate because of "the factual issue of [Archer's] waiver of the fifteen (15) day election period under the *Bond*." (Doc. 92, p. 6). In support, DSIC cites an affidavit submitted by Edward Etcheverry, DSIC's counsel. (Doc. 95-1). Mr. Etcheverry reports in his affidavit a July 29, 2014, telephone conference with Archer's corporate counsel, Eric Klupp, in which Mr. Klupp

"extended the 15-day time frame in the *Bond* until AWC provided DSIC with the requested documentation." (*Id.* ¶ 6). After the July 29, 2014, telephone conference, Mr. Etcheverry sent *DSIC* an email stating that Archer agreed to extend the 15-day period set forth in the Bond. (*Id.*). Mr. Etcheverry's affidavit does not disclose that the purported waiver was ever confirmed in writing *with Archer*. (Doc. 95-1). Archer argues that Florida's Statute of Frauds precludes waiver in this instance, as the subject agreement could not be orally modified. (Doc. 112, pp. 7–9).

"Whether a waiver has occurred in any given situation is generally a question of fact." *Hill v. Ray Carter Auto Sales, Inc.*, 745 So. 2d 1136, 1138 (Fla. 1st DCA 1999). However, the alleged waiver here is invalid as a matter of law[17] due to the operation of Florida's Statute of Frauds (the "Statute"), which provides, in part:

> No action shall be brought whereby to . . . charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.

Fla. Stat. § 725.01. Contracts for suretyship, like the Bond, are subject to the Statute. *See, e.g.*, *id.*; Restatement (Second) of Contracts §§ 112, 116 (1981).[18] "[A] written contract falling within the Statute of Frauds cannot be orally modified through the operation of promissory estoppel," or waiver where the alleged waiver pertains to a material component of the agreement, and not "a simple delay in performance." *DK*

---

[17]  Whether an oral agreement is unenforceable due to the Statute of Frauds is a "pure question of law." *DK Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85, 91 (Fla. 2013).

[18]  The "leading purpose" rule does not render the Statute inapplicable to the Bond. *See Al Booth's, Inc. v. Boyd-Scarp Enters.*, 518 So. 2d 422, 423 (Fla. 5th DCA 1988); Restatement (Second) of Contracts § 116.

*Arena, Inc.*, 112 So. 3d at 96. Here, the alleged agreement tolled the time limit prescribed by the Bond, and conditioned the un-tolling on Archer providing DSIC with a litany of documents, where Archer's provision of said documents was not contemplated by the terms of the Bond.[19] As in *DK Arena, Inc.*, the alleged modification in this case involved far more than "a simple delay in performance." Therefore, the alleged waiver of the Bond's fifteen-day time limit for investigating and denying a claim, if it occurred, was invalid.

> c.      Whether Archer Breached the Bond or Had the Right to Assert
>
> Remedies Under the Subcontract Against DSIC

DSIC's remaining arguments opposing Archer's motion for summary judgment are equally unavailing for the reasons expressed in Section III.A, *supra*.

## IV.    CONCLUSION

In light of the foregoing, the Court finds that DSIC breached the Bond by failing to take corrective action within fifteen days of receiving the Bond Claim. Furthermore, Archer was permitted under the Subcontract and Bond to hire LaFleur as replacement contractor. Finally, DSIC is liable to Archer for the costs it incurred remediating Prince's defective performance. The Court retains jurisdiction over this matter to preside over the determination of damages.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Plaintiff DSIC's Motion for Summary Judgment (Doc. 96) is **DENIED**.

2.  Defendant Archer Western Contractors, LLC's Motion for Summary Judgment (Doc. 82) is **GRANTED**.

---

[19]   As discussed above, the notion that Archer was obligated to provide DSIC with all the default-proving documents DSIC requested is at odds with DSIC's "independent investigation" envisioned by the Bond.

3. The Clerk is directed to enter a judgment declaring that Archer Western Contractors, LLC, has prevailed on its Counterclaim seeking a declaratory judgment that:

   a. Developers Surety and Indemnity Company breached the Subcontractor Performance Bond #504957P;

   b. Archer was authorized to hire a replacement subcontractor, LaFleur Nurseries & Garden Center, to remediate Prince's default; and

   c. Developers Surety and Indemnity Company is liable to Archer for the costs of remediating Prince's default.

**DONE AND ORDERED** in Orlando, Florida on May 7, 2018.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties